991 F.2d 799
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
GOLF RESORTS, INC. and Jan Muskatevc, Plaintiffs-Appellants,
v.
Theodore J. PESHAK, Margaret Peshak, Keith Kampert and Leona
Kampert, Defendants-Appellants.
 No. 91-2251.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 12, 1992.
Decided April 13, 1993.
Order on Denial of Rehearing
July 19, 1993.
 
 Before BAUER, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 The plaintiffs, Golf Resorts, a Wisconsin corporation, and Jan Muskatevc, a former Wisconsin resident presently living in Florida, brought this action to enforce an alleged agreement with the defendants, all Illinois residents, to purchase the Lost Creek Golf Course in Door County, Wisconsin.[1] The district court held that an agreement existed between the parties and ordered specific performance. The defendants now appeal.
 
 I. BACKGROUND
 
 2
 In 1985, Golf Resorts leased the Lost Creek Golf Course from Par Five, a Wisconsin corporation. In 1986, the defendants, Leona and Keith Kampert and Margaret and Theodore Peshak, acquired title to the golf course by a sheriff's sale. The defendants agreed to subordinate their rights in the golf course to Golf Resorts' rights under the lease. The lease ran to December 31, 1985, renewable at the option of the tenant for up to three years. It was successively renewed so that it expired December 31, 1988.
 
 
 3
 In January, 1988, Mr. Muskatevc and the defendants had negotiated for sale of the property to Golf Resorts. On March 22, 1988, Mr. Muskatevc, Mr. Peshak and Mr. Kampert signed handwritten documents entitled "Intention to Agree." Mr. Peshak and Mr. Kampert later prepared a typewritten document entitled "Intention to Agree to Purchase Lost Creek Golf Course." It was dated March 22, was generally similar to the handwritten ones, but contained several changes. They signed it and sent it to Mr. Muskatevc, asking him to sign and return it. At trial, the defendants asserted that the typewritten paper was never returned to them. The district court found, as Mr. Muskatevc testified, that he had signed and returned one copy to the defendants, but failed to sign the copy he retained.
 
 
 4
 The document describes the property and states that Golf Resorts and/or Mr. Muskatevc "agrees to purchase" the property from Mr. Peshak and Mr. Kampert for $545,000 ($500,000 for the real estate and $45,000 for equipment). The document sets out a payment schedule for payments totaling $90,000 ($5,000 upon acceptance of the offer, $2,500 on the first of each month for six months (May to October), $20,000 on May 15, $25,000 on November 1, all in 1988, and $25,000 on March 31, 1989). The document states that a "formal, legal closing agreement" shall be made on or before March 31, 1989, or when a total of $90,000 has been paid. The document then states, "Present lease between buyer and sellers is now considered void." The document goes on to provide that the sellers will furnish a deed and title with a first mortgage of $455,000 held by the sellers at an interest rate of 8%, payable in six installments per year for five years, with a balloon payment March 31, 1994.
 
 
 5
 The lease had required the tenants to make a security deposit of $20,000, only $7,000 of which had been paid. The March 22 typewritten document stated:
 
 
 6
 Sellers agree to allow present $7,000 security deposit to be part of the November 1, 1988 payment and to forgive all interest due or to become due on the $13,000 security deposit not paid. Any late payments gives the sellers the right to immediate foreclosure and a penalty of two (2) percent of the payment due for any month or fraction thereof that payment is late.
 
 
 7
 Buyer agreed to maintain and to insure the property.
 
 
 8
 The document made no reference to Mrs. Peshak or Mrs. Kampert or their interest in the property. They did not sign.
 
 
 9
 Mr. Muskatevc made the initial $5,000 payment and for each of the following six months, he sent a $2,500 check to the defendants with the notation "additional down payment on purchase of Lost Creek Golf Course per 3-22 agreement."
 
 
 10
 With respect to the initial $5,000 payment, Mrs. Peshak testified that she understood that it was being paid as part of the purchase price and she accepted and deposited it because she believed there was an agreement whereby Muskatevc would be purchasing the golf course.
 
 
 11
 Mrs. Kampert testified that her husband signed in her behalf as well as his and that if the payments had been made, she would have given a deed. The six $2,500 payments were the same amounts which would have been due during the summer of 1988 under the lease. Judge Evans found that defendants "continued to accept his monthly payments, clearly marked as going toward the purchase of the course."
 
 
 12
 Because Mr. Muskatevc was unable to recover the proceeds of the sale of a house, as he had planned, the larger payments of $20,000 due on May 15 and $25,000 (less $7,000) due on November 1, 1988 were not made. In January, Mr. Muskatevc offered a lower price of $500,000, but the offer was rejected. Approximately two months before the scheduled closing date, the defendants indicated that they would not convey the property to Mr. Muskatevc. The district court found that the defendants had received a better offer, $1 million, for the property. On March 1, 1989, thirty days prior to the scheduled closing date, Mr. Muskatevc brought this action in the federal district court for specific performance of the agreement.
 
 
 13
 On the same day, the defendants filed an action in state court to evict Mr. Muskatevc and Golf Resorts from the golf course. A judgment of eviction was entered on June 8, 1989, and the Wisconsin Court of Appeals later affirmed the judgment.
 
 
 14
 The state courts were well aware of the action in federal court and marked a boundary between the issues being decided in the state court action and those left for decision in the federal court action. Circuit Judge Koehn said in his opinion granting the Peshaks and Kamperts an order of eviction:
 
 
 15
 This action however is one for eviction wherein the possession of the property is sought.
 
 
 16
 The Federal Court action is one in which rights of ownership are alleged and are to be determined.
 
 Later in the opinion, he wrote:
 
 17
 Defendants [in the state court, plaintiffs in federal court] argued that the "Intention to Agree was a valid contract. This opinion does not address that question. That matter is before the Federal Court."
 
 
 18
 In the unpublished decision of the Court of Appeals, affirming the judgment of eviction, Judge Myse referred to the March 22 documents and stated that:
 
 
 19
 None of these documents give the Muskatevcs a possessory right to this property. These documents are not land contracts, nor do they vest Muskatevc with either equitable or legal title to the property.
 
 
 20
 While the Muskatevcs may claim a right to obtain a land contract interest in the property, all claims derived from these documents are pending in federal court.... The clear legal effect of these documents creates no right of immediate possession. At best the Muskatevcs have asserted a right to obtain a possessory right at some time in the future. This claim is not before this court.
 
 
 21
 The statements are significant in view of defendants' arguments concerning res judicata and collateral estoppel.
 
 
 22
 The district court found that Mr. Muskatevc had invested substantial time and money in the golf course. The court determined that the document was a sufficient writing to meet the requirements of the statute of frauds, Wis.Stat. § 706.02, and that even if the writing was somehow deficient, the doctrine of part performance from Wis.Stat. § 706.04(3) should allow enforcement. The court found:
 
 
 23
 The equities are on the side of the plaintiffs. Mr. Muskatevc enthusiastically put all his energies into improving the golf course. He testified that he worked exceedingly long hours. The course became almost an obsession with him.
 
 
 24
 So finding, the district court ordered specific performance of the agreement to purchase. The district court ordered that Mr. Muskatevc be allowed 60 days within which to pay the remainder of the first $90,000 and to demonstrate his ability to make the remainder of the payments. If both are not accomplished in 60 days, plaintiffs' rights will cease to exist. If both are accomplished, defendants must sell the property to the plaintiffs with a schedule of mortgage payments similar to the schedule in the March 22 typewritten agreement.
 
 II. DISCUSSION
 A. Collateral Estoppel
 
 25
 We must first consider the effects of the state court's judgment of eviction. The federal courts, generally, give the same preclusive effect to a state court judgment that the courts of that state would give to the judgment. Kunzelman v. Thompson, 799 F.2d 1172, 1176 (7th Cir.1985). In Wisconsin, "[a]n issue is barred by collateral estoppel only if it was litigated, determined, and necessary to the decision of the prior proceeding." Reckner v. Reckner, 105 Wis.2d 425, 436, 314 N.W.2d 159, 165 (Wis.Ct.App.1981).
 
 
 26
 On appeal of the judgment of eviction, Mr. Muskatevc argued that the signed agreement vested him with possessory rights to the property such that he could not be evicted. The prior lease had expired. The Wisconsin Court of Appeals determined that the agreement was not a land contract and, thus, did not confer present possessory rights upon Mr. Muskatevc. Since Mr. Muskatevc had no present possessory rights to the golf course, the court affirmed the judgment of eviction. A land contract consists of the transfer of equitable title to the buyer while the seller retains legal title to the property as security for the satisfaction of the buyer's payment obligations under the land contract. Anthony J. Handzlik, Comment, Mortgage Foreclosure as Fraudulent Conveyance: Is Judicial Foreclosure an Answer to the Durret Problem, 1984 Wis.L.R. 195, 198 n. 20. If the state court had found that the agreement constituted a land contract, it would follow that Muskatevc derived a right to present possession. Thus, the determination that the agreement did not constitute a land contract was necessary to the state court's decision.
 
 
 27
 Since the issue of whether the agreement constitutes a land contract was litigated and determined in the state court proceedings and was necessary to the state court's decision, the parties are collaterally estopped from relitigating that issue in the federal courts. Thus plaintiffs could no longer claim in their federal action that the agreement was a land contract.
 
 B. Agreement to Purchase
 
 28
 Although we are prevented by collateral estoppel from deciding that the agreement constitutes a land contract, we conclude that the agreement does embody an agreement by defendants to sell the property to plaintiffs, an issue which the state court did not decide. The document is entitled "Intention to Agree to Purchase Lost Creek Golf Course." However, "it is well settled that the name which parties give to an agreement does not control the interpretation of it." Rice v. Reich, 51 Wis.2d 205, 208, 186 N.W.2d 269, 271 (1971).
 
 
 29
 [T]he cornerstone of contract construction is to ascertain the true intentions of the parties as expressed by the contractual language. This court has said that the purpose of judicial construction is to determine what the parties contracted to do as evidenced by the language they saw fit to use.
 
 
 30
 State ex rel. Journal/Sentinal, Inc. v. Pleva, 155 Wis.2d 704, 711, 456 N.W.2d 359, 362 (1990).
 
 
 31
 The typewritten agreement constitutes an agreement to purchase and sell. The agreement sets out the parties, Mr. Muskatevc and Golf Resorts as buyer, and Mr. Kampert and Mr. Peshak as sellers; a description of the property to be sold; the purchase price of $545,000 with a total of $90,000 to be paid by closing; the time for closing, March 31, 1989; and the basic terms of a mortgage for the balance.
 
 
 32
 c. Statute of Frauds
 
 
 33
 The defendants argue that the agreement is unenforceable because it does not fulfill the statute of frauds, Wis.Stat. § 706.02. Generally, transactions by which any interest in land may be affect in law or in equity are not valid unless evidenced by a conveyance, "signed by or on behalf of each of the grantors." Wis.Stat. § 706.02(d). Mrs. Peshak and Mrs. Kampert are title owners to the golf course along with their husbands. Mrs. Peshak and Mrs. Kampert did not sign the agreement. The district court found that Mr. Peshak and Mr. Kampert signed on behalf of their wives.
 
 
 34
 A conveyance signed by one purporting to act as agent for another shall be ineffective as against the purported principal unless such agent was expressly authorized, and unless the authorizing principal is identified as such in the conveyance or in the form of a signature or acknowledgment.
 
 
 35
 Wis.Stat. § 706.03(1). The finding of agency was not clearly erroneous, but there was nothing in the typewritten agreement identifying the wives as principals on whose behalf the husbands signed. Mr. Muskatevc argues that a spouse's signature is not required unless the conveyance relates to a homestead. If the spouse is a joint owner, however, and the agreement purports to sell the entire property, the joint owner's signature is required, and the court will not recognize an implied agency between spouses to convey their jointly owned property. Nelson v. Albrechston, 93 Wis.2d 552, 563, 287 N.W.2d 811, 817 (1980). Thus, contrary to the district judge's conclusion, the agreement does not satisfy the requirements of § 706.02.
 
 
 36
 The district court, alternatively, found that the equitable estoppel exception under § 706.04(3)(a) was satisfied. That section provides that a transaction may be enforceable under doctrines of equity if
 
 
 37
 [A]ll of the elements of the transaction are clearly and satisfactorily proved and, in addition ...
 
 
 38
 (3) The party against whom enforcement is sought is equitably estopped from asserting the deficiency. A party may be estopped whenever, pursuant to the transaction and in good faith reliance thereon, the party claiming estoppel has changed his position to his substantial detriment under circumstances such that the detriment so incurred may not be effectively recovered otherwise than by enforcement of the transaction, and either
 
 
 39
 (a) The grantee has been admitted into substantial possession or use of the premises or has been permitted to retain such possession or use after termination of a prior right thereto or
 
 
 40
 (b) The detriment so incurred was incurred with the prior knowing consent or approval of the party sought to be estopped.
 
 
 41
 Wis.Stat. § 706.04(3).
 
 
 42
 The district court's implicit finding that Mr. Muskatevc changed his position to his substantial detriment is not clearly erroneous.
 
 
 43
 The acts alleged to be in detrimental reliance on the agreement must occur after the agreement was entered and must be "solely and obviously referable to the contract." In Matter of Estate of Lade, 82 Wis.2d 80, 86, 260 N.W.2d 665, 668 (1978). The acts cannot be such that they are equally referable to occupancy of the property as a tenant. Weigand v. Gissal, 28 Wis.2d 488, 495, 137 N.W.2d 412, 416 (1965).
 
 
 44
 Mr. Muskatevc testified that before the parties signed the agreement to purchase he, as the tenant, was responsible for 50% of the cost of any improvements and the defendants, as the landlords, were responsible for the remaining 50%. (Tr. at 8.). He testified that after the agreement was entered, he substantially increased the number of improvements made to the property at a cost of approximately $40,000. He did not ask the defendants to contribute to the cost of these improvements because he believed that the property belonged to him and that the lease was void. He testified that he made the following improvements to the property:
 
 
 45
 Improvements on the dredging of the creek, reswaling the fairways, starting digging another pond where we had a casual water problem. We hauled in new sand for the top dressings, special sand for the top dressing of the greens. We applied more chemicals, fertilizers, fungicides, herbicides. I leased ten new golf carts. I bought ten new hand carts, pull-carts for rental. I bought a freezer. I bought another trap rig, starting buying more equipment.
 
 
 46
 (Tr. at 32.) Mr. Muskatevc also made a $5,000 payment to the defendants upon entering the agreement to purchase. (Tr. at 19-20.) The defendants argue that this payment was in partial payment of a security deposit that had never been made under the lease. However, Mr. Muskatevc had owed $13,000 on the security deposit for some time (Tr. at 53), and the timing and amount of the $5,000 payment weigh against a finding that the payment was equally referable to the lease and the agreement to purchase. The $5,000 check contained a notation that it was a down payment on the March 22 agreement to purchase. The monthly checks of $2,500, an amount equal to the monthly rental payments under the lease, each contained a notation to the effect that the payment was additional down payment on the purchase of the golf course per the agreement to purchase. In addition, Mr. Muskatevc testified that he continued to make payments for insurance on the property in 1989 after the termination date of the lease. (Tr. at 33.)
 
 
 47
 The showing of acts referable to the agreement and in reliance thereon was adequate.
 
 
 48
 In addition to detrimental reliance, § 706.04(3) requires either (a) possession by the alleged grantee or (b) knowing consent or approval prior to incurring the detriment.
 
 
 49
 The deficiency in the contract was that Mrs. Kampert and Mrs. Peshak, who were owners, did not sign and the written agreement failed to identify them as principals for whom their husbands signed. The testimony of both women showed they considered that a contract of sale had been made. We think their knowing consent or approval was shown, and thus (b) was satisfied.
 
 
 50
 We think (a) was also satisfied. Plaintiff had been in possession under a lease. The March 22, 1988 agreement provided that "Present lease between buyer and sellers is now considered void." They remained in possession until eviction in 1989.
 
 
 51
 We acknowledge that there is at least superficial tension between the state court decision that in 1989 plaintiffs had no possessory rights and the proposition that plaintiffs had been permitted to retain possession after termination of their right as lessees. Both the state trial and appellate courts, however, had taken pains to reserve the issue of validity and effect of the March 22 document to the federal court action, except that the appellate court decided it was not a land contract.
 
 
 52
 Under this circumstance, we conclude that this particular issue was not litigated, and the state court judgment did not preclude a finding in the federal action that the agreement was enforceable under § 706.04(3)(a).
 
 D. Breach of Agreement to Purchase
 
 53
 The defendants argue that Mr. Muskatevc had previously breached the agreement by failing to make the $20,000 payment when due on May 15, 1988, and the $25,000 payment when due on November 1, 1988. Thus, the defendants argue that the agreement was terminated and no longer binding upon them. The agreement set out due dates for payments on Mr. Muskatevc's obligation and a date for closing, but did not expressly state that time was of the essence. Although the agreement stated, "Any late payments gives the Sellers the right to immediate foreclosure and a penalty of two (2) percent of the payment due for any month or fraction thereof that payment is late," the defendants had not demanded performance or notified Mr. Muskatevc that he was in default due to the missed payments.
 
 
 54
 "It is well settled in Wisconsin that time is not of the essence unless it is expressly made so by the terms of the contract, or by the conduct of the parties." Stork v. Felper, 85 Wis.2d 406, 411, 270 N.W.2d 586, 589 (Wis.Ct.App.1978). When time is not made expressly of the essence in the contract, the aggrieved party must give notice to the breaching party fixing a reasonable time for performance, and without such notice the contract will not terminate. Id. at 412. The agreement arguably implicitly made time of the essence by giving the defendants the right to "immediate foreclosure" upon late payment of Mr. Muskatevc's obligations. A party to a contract, however, may waive a provision inserted in the contract for that party's benefit. Godfrey Co. v. Crawford, 23 Wis.2d 44, 50, 126 N.W.2d 495, 498 (1964). The defendants did not assert their foreclosure right when the payments became overdue and, thus, waived the right to prompt payment, in effect, giving Mr. Muskatevc an indefinite extension on the time for payment. The defendants did not later give Mr. Muskatevc notice fixing a time for performance, and therefore, the agreement did not terminate due to Mr. Muskatevc's failure to make payments on the dates specified.
 
 
 55
 The defendants then repudiated the agreement when they indicated to Mr. Muskatevc approximately one month prior to the closing date that they would not convey the property to him. Mr. Muskatevc was then entitled to bring an action for breach of the agreement to purchase, and he did so.
 
 E. Specific Performance
 
 56
 The defendants argue that specific performance was not an appropriate remedy in this case. Mr. Muskatevc did not tender performance prior to bringing this action. However, when one party to a contract repudiates the contract and anticipatorily breaches, the other party is not required to tender performance prior to instituting an action for specific performance. Stork, 85 Wis.2d at 412.
 
 
 57
 The defendants assert that the terms of the agreement are not sufficiently definite and that the court essentially ordered the parties to make a contract rather than specifically enforcing a prior agreement. Specific performance is an equitable remedy within the discretion of the trial court, and we will not disturb the trial court's judgment absent an abuse of discretion. Anderson v. Onsager, 155 Wis.2d 504, 513, 455 N.W.2d 885, 889 (1990) (quoting Depies-Heus Oil Co. v. Sielaff, 246 Wis. 36, 41 (1944)). "[U]nless in the course of a trial court's exercise of discretion there are revealed factual or legal considerations which would make specific performance of the contract unfair, unreasonable or impossible, specific performance of a contract to sell land should be ordered as a matter of course." Anderson, 155 Wis.2d at 512. The district court found that it was equitable to enforce the agreement to purchase. We cannot say that the district court abused its discretion in awarding specific performance. The agreement to purchase sets out the essential terms of the contract, price, description of the land, and the parties. These terms are sufficiently definite for the court to enforce; the court is not ordering the parties to make a contract but is ordering the defendants to perform under an existing contract.
 
 
 58
 The defendants further argue that the district court's order is inappropriate as allowing Mr. Muskatevc a right of redemption. A right of redemption is not available on an agreement to purchase, but only as a corollary to a foreclosure on a land contract. Anderson v. Nelson, 38 Wis.2d 509, 517, 157 N.W.2d 655, 659-60 (1968). When a purchaser breaches his or her obligations under a land contract, the seller may elect to bring an action for strict foreclosure declaring the contract void, and the purchaser's rights under the contract are forfeited. The court may, however, allow the purchaser a right of redemption, one more chance to perform his or her obligations under the contract. Kallenbach v. Lake Publications, Inc., 30 Wis.2d 647, 652, 142 N.W.2d 212, 215 (1966).
 
 
 59
 The defendants have misinterpreted the district court's order. The district court did not grant a right of redemption to Mr. Muskatevc which would be appropriate only in an action for strict foreclosure. The court ordered that the agreement to purchase be specifically performed, which performance necessarily included payment of the remainder of the purchase price by Mr. Muskatevc. A purchaser may receive specific performance of a contract for sale of land, and where the seller has anticipatorily breached prior to the closing date, as here, the purchaser also will not have fully performed. The specific performance order must necessarily include time, reasonable under the circumstances, for the plaintiff to perform as well. The district court did not abuse its discretion.
 
 
 60
 The judgment of the district court is AFFIRMED.
 
 ORDER ON PETITION FOR REHEARING
 
 61
 July 19, 1993.
 
 
 62
 Defendants have called our attention to an alternative argument in their brief on appeal, which we did not directly address in our order disposing of the appeal. that argument was: "if specific performance is granted to the Plaintiffs, then the Defendants should receive restitutionary compensation for their substantial investment in the golf course after they regained possession of it in 1990, less the value of any benefits received by them as a result of such possession." Appellants' Brief, p. 33.
 
 
 63
 We have reexamined the record to see whether it provides support for this argument.
 
 
 64
 Defendants introduced evidence, by no means conceded, that they had spent $116,000 "on the equipment situation," although there was also a reverence to items of building maintenance. This evidence appears to have been offered to support defendants' counterclaim, alleging that plaintiffs had failed to maintain the property as required by their lease. Evans said he was "not convinced that the equipment was damaged beyond that occurring with normal use." He dismissed all the counterclaims, and defendants have not argued this was error.
 
 
 65
 In any event, we find nothing in the record (which includes defendants' trial and post-trial briefs) presenting a claim that if the court granted specific enforcement there must be an adjustment for defendants' investment, less benefits, after they regained possession. After entry of judgment granting specific enforcement, defendants filed no motion under Rule of Civil Procedure 59 seeking the adjustment now claimed. As we view it, they waived the claim by failing to present it to the district court.
 
 
 66
 No judge in regular active service* or judge who was a member of the panel has requested a vote on the suggestion of rehearing in banc. the members of the panel have all voted to deny the petition for rehearing, and it is hereby
 
 
 67
 DENIED.
 
 
 
 [1]
 Jurisdiction in the district court was based on diversity of citizenship. Wisconsin law applies to all substantive issues
 
 
 *
 Judge Cudahy did not participate in consideration of the petition for rehearing in banc